FOUR TWELVE WEST SIXTH COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1692, 3946. Promulgated June 6, 1946.

*J. Marion Wright, Esq.*, for the petitioner.
*B. H. Neblett, Esq.*, and *T. M. Mather, Esq.*, for the respondent.

OPINION.

ARNOLD, *Judge*: These proceedings involve income and excess profits taxes as follows:

| Docket No. | Year | Income tax | Excess profits tax |
|---|---|---|---|
| 1692 | 1939 | $506.66 | |
| 3946 | 1936 | 1,683.39 | |
| | 1937 | 1,538.15 | $271.60 |
| | 1938 | 551.97 | |

The principal issue is the basis to be used for depreciation purposes, i. e., whether cost or fair market value. The other issue is whether petitioner realized additional income for the taxable years by virtue of collections on certain accounts and notes receivable which had no cost basis on petitioner's books. A third error, relating to the taxable year 1939, was apparently abandoned, as the allegations were not pressed.

The stipulated facts are adopted as our findings of fact. The pertinent portions thereof are herein summarized.

Petitioner is a California corporation, incorporated February 4, 1935. Its principal office is at San Francisco. Its business consists

of the ownership under lease and the operation of an office building and equipment therein, located at 412 West Sixth Street, Los Angeles, California. It kept its books and filed its tax returns on the accrual basis. Its tax returns were filed in the first collection district of California.

In May 1933 the Detwiler Corporation, a California corporation, hereinafter referred to as Detwiler, was in default on $294,000 face amount of its bonds. The bonds were a portion of an authorized issue of $500,000 first closed mortgage 6½ per cent sinking fund gold bonds under a trust indenture executed in September 1923. They were secured by the unexpired term of a 99-year lease executed in 1912, a 14-story class A office building erected by the first lessee in 1914, the equipment, furniture, and fixtures therein, and certain notes and accounts receivable covering uncollected rent. Detwiler valued the building, machinery, and furniture on its books as follows: building, $1,433,575.47; machinery and equipment, $206,848.21; and furniture and fixtures, $3,734.34.

The bondholders of Detwiler formed a bondholders' protective committee, hereinafter referred to as the committee, under an agreement dated May 25, 1933, for the purpose of attempting to save the lease, or, if not, to salvage as much as possible for the bondholders. Pursuant to the terms of the bondholders' protective agreement, the holders of $260,500 face value of the $294,000 of bonds outstanding deposited their bonds with the committee.

After various negotiations the committee and S. Waldo Coleman, representing certain San Francisco interests experienced in building management and operation, developed a plan. Under date of September 5, 1934, the committee advised the bondholders of the plan and urged its adoption. Briefly, the plan provided for the formation of a new California corporation, all of the preferred stock and 51 percent of the common stock of which would be acquired by the Coleman interests, and 49 per cent of the common would be acquired by the bondholders of Detwiler. The committee was to cause foreclosure under the trust indenture, bid in the Detwiler properties at the foreclosure sale, and transfer them to the new company for 49 per cent of its common stock. The Coleman interests were to purchase from the new company all of its preferred and 51 per cent of its authorized shares of common stock for a sum not in excess of $100,000. Such sum was to be used by the new company to meet the following estimated expenses and liabilities: unpaid and delinquent taxes, $23,108.47; trustee's fees, advances by trustee, costs, and expenses of foreclosure, pro rata distribution to dissenting bondholders, etc. $21,922.95; the committee's expenses, $5,000; the title company's fee, $822; costs of incorporation, alterations and improvements, $25,000

to $35,000; and cash working fund, $10,000. If less than $100,000 was needed the number of shares of common stock was to remain undiminished and a smaller number of preferred shares issued. The preferred stock was entitled to 7 per cent dividends, cumulative after the first five years, was callable at not in excess of 5 per cent, was convertible into common at two for one, had equal voting rights with common, and was entitled to the benefit of a sinking fund until all preferred shares were purchased or redeemed.

On October 3, 1934, the committee notified the Metropolitan Trust Co., Los Angeles, successor trustee under the trust indenture of September 1, 1923, that it had adopted the plan aforementioned and proposed to carry it out and make it effective. Notice of default by Detwiler was duly given and request and demand was made on the trustee to sell under the trust indenture and carry out the escrow instructions given therewith.

On February 11, 1935, the trustee offered the leasehold properties mentioned above for sale at public auction to the highest bidder for cash. Representatives of the committee bid for the entire properties the sum of $44,000 in cash, which was the only bid made at the sale and was, therefore, accepted by the trustee. Payment of the bid price was made with $17,754.94 in cash and the application of $260,500 principal amount of deposited bonds, together with the appurtenant interest coupons in payment of the balance of $26,245.06. The trustee applied the cash in payment of preferred claims as follows:

| | |
|---|---:|
| Cash advanced by Bank of America, trustee | $9,504.51 |
| Interest thereon to Feb. 11, 1935 | 1,867.26 |
| Trustee's fee to Feb. 11, 1935 | 191.67 |
| Trustee's foreclosure fee | 2,250.00 |
| Expenses of sale | 522.40 |
| Revenue stamps | 44.00 |
| Payments to nonassenting bondholders | 3,375.10 |
| Total | 17,754.94 |

The $17,754.94 in cash was advanced by the Coleman interests, as the new company (the petitioner herein) was not, on the date of sale, authorized to issue its capital stock.

The nonassenting bondholders held bonds in the principal amount of $33,500, so that the $3,375.10 paid them was equal to 10.0749 of the face amount of their bonds, which is precisely the ratio of value assigned to the $260,500 face amount of bonds applied to the purchase price of $44,000 for the leasehold assets.

Pursuant to the plan, petitioner issued 521 shares of its no par common stock to the committee for assets, and 542 shares of no par common and 600 shares of preferred to the Coleman interests for cash. Later in 1935 petitioner issued 260 more shares of preferred to the Coleman

interests for $26,000. During the taxable year petitioner redeemed and retired 530 shares of preferred stock at 105.

The opening entries on petitioner's books show that the Coleman interests, represented by North American Investment Co., and California Properties, Inc., assignees of S. Waldo Coleman and in no way related to or connected with Detwiler, invested $60,000 in petitioner's capital stock. North American invested $15,000, which was represented by 150 shares of preferred and 135½ shares of common; California Properties invested $45,000, which was represented by 450 shares of preferred and 406½ shares of common. The entire $60,000 was allocated to preferred on the books and no part thereof was allocated to the 542 shares of common acquired with the 600 shares of preferred. The 521 shares issued to the bondholders were set up on the books at a value of $22,924.25, and the same value was shown for the total number of shares of common stock outstanding, namely, 1063 shares.

Petitioner's books show the cost of the Detwiler properties to it as 521 shares of common capital stock and $66,174.78 of obligations assumed and paid. The 521 shares of common stock were valued on the books at $22,924.25, or a total cost per books of $89,099.03. The valuation for the common stock was explained with the statement that a "valuation of $17,526.14 was placed on all assets, other than cash in the sum of $5,398.11, acquired in exchange for the above stock by appropriate resolution of the Board of Directors of the Four Twelve West Sixth Co., on March 31, 1935, as per the minutes of their meeting of that date."

The office building, machinery and equipment, and furniture and fixtures were set up on petitioner's books originally at $75,000. Adjusting journal entries dated December 31, 1935, allocated this sum as follows: building, $63,862.64; machinery, $11,026.09; and furniture, $111.27. During 1936 an independent appraisal fixed the fair market value of these assets at $150,000 as of February 11, 1935. By entries dated December 31, 1936, petitioner increased the book value of each of the above assets by 100 per cent.

In addition to the depreciable assets aforementioned, petitioner acquired from the bondholders' committee prepaid insurance premiums in the amount of $3,846.59 and prepaid taxes in the amount of $5,094.93.

Subsequent to the taxable years a revenue agent fixed the value of the unexpired term of the lease at $67,468.94 as of February 11, 1935. By journal entries dated June 30, 1940, petitioner set up this value for its leasehold upon its books of account.

The fair market value of the depreciable properties at the time acquired in 1935 was: buildings, $127,725.28; equipment, furniture and fixtures, $22,274.72; unexpired portion of lease, $67,468.98.

Accounts and notes receivable acquired in 1935 with the depreciable assets had a fair market value equal to recoveries thereon in subsequent years, which recoveries amounted to $9,342.82 in 1935; $4,544.86 in 1936; $1,779.48 in 1937; $374.88 in 1938; $51.25 in 1939; or a total of $16,093.29. Petitioner set up receivables on its books totaling $93,716.19 and offset them by reserves in the same amounts.

Petitioner's income tax return for 1935 showed depreciable assets as follows:

| | |
|---|---|
| Buildings | $63, 862. 64 |
| Machinery and equipment | 11, 026. 09 |
| Furniture and fixtures | 201. 02 |
| Other depreciable assets | 28, 183. 04 |

In its income tax returns for the taxable years petitioner used the fair market values of the building, machinery, and fixtures as the basis for depreciation.

The deficiency notices show that respondent increased petitioner's income by the amounts recovered in each taxable year, as above set forth, and disallowed the following amounts from the depreciation deduction claimed by petitioner in each year: 1936, $4,798.91; 1937, $4,797.53; 1938, $4,808.78; 1939, $4,808.78. Respondent explained his depreciation adjustment as follows (Docket No. 1692) :

The basis used in your return and in the report of examination was the fair market value of the assets, whereas, under section 113 (a) of the Revenue Act of 1934, since none of the exceptions therein apply, the correct basis is the cost of the assets to you, even though acquired at a bargain price. The cost is measured by the liabilities assumed and the fair market value of the common stock issued therefor, which value is held to be not more than the $22,924.25 originally assigned at incorporation, eliminating the paid in surplus later set up. The concurrent issue of 542 shares of common stock with 600 shares preferred, for $60,000.00 cash, all of which was assigned as value of the preferred stock, would preclude any claim for an increased value for the common stock issued for other assets.

The first issue is the basis to be used for depreciation purposes. In its 1935 return petitioner used the book value as its basis for depreciation. For the taxable years 1936, 1937, 1938, and 1939 petitioner used the fair market value as its basis, which represented a 100 per cent increase in the depreciable base for its building, its machinery and equipment, and its furniture and fixtures. The fair market values of the assets were fixed by an independent appraisal and are stipulated by the parties hereto to be the values of the assets acquired by petitioner as of February 11, 1935. In computing the deficiencies herein the respondent fixed petitioner's "cost basis" for depreciation purposes as $74,888.73. This sum is equal to the total of petitioner's book values for its building, machinery, and equipment assets as adjusted on December 31, 1935 (building, $63,862.64, and machinery, $11,026.09, = $74,888.73).

Petitioner's first contention is that the transactions involved herein constitute a reorganization within the meaning of that term under section 112 (a), (b) (3), (4), (5), (g) (1) (B) and 113 (a) (7) and (8), Revenue Act of 1934, and that the basis of the property in its hands is the same as the basis of the property to Detwiler, which was in excess of the fair market value of the depreciable assets. Secondly, petitioner contends that the basis for depreciation is the fair market value of the property when acquired in exchange for its common stock.

We agree that the present transactions come within the definition of a reorganization as that term is defined in section 112 (g) (1) (B) of the Revenue Act of 1934. The pertinent portion of the definition states: "The term 'reorganization' means * * * (B) the acquisition by one corporation in exchange solely for * * * part of its voting stock * * * of substantially all of the properties of another corporation * * *." Here, the bondholders of Detwiler, pursuant to the plan, exchanged all of its properties, which were acquired at the foreclosure sale, solely for a part of petitioner's voting stock, i. e., 49 per cent of the common stock. Under these facts a statutory reorganization occurred. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179, affirming 41 B. T. A. 324. The indebtedness of Detwiler assumed by petitioner is to be disregarded under section 213 (g) (1), Revenue Act of 1939, amending section 112 (g) (1), Revenue Act of 1934.

The general rule upon the sale or exchange of property is that the entire amount of the gain or loss shall be recognized. Sec. 112 (a), Revenue Act of 1934. The exceptions to this general rule are found in section 112 (b), subsections (1) to (5), inclusive. While petitioner refers to subsections (3) to (5), inclusive, in setting up its argument on brief, the emphasis is placed on subsection (3). This subsection prohibits recognition of gain or loss, in so far as here pertinent, if stock or securities in one corporation are exchanged solely for stock or securities in another corporation in pursuance of a plan of reorganization, each corporation being "a party to a reorganization" as defined in subsection 112 (g) (2). Petitioner's reliance upon this subsection is for the purpose of securing its transferor's basis for depreciation, unadjusted by any recognized gain or loss on the transaction as provided in section 113 (a) (7) of the Revenue Act of 1934.[1]

---

[1] (7) Transfers to corporation where control of property remains in same persons.—If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *

Assuming, *arguendo*, that the transfer here comes within subsection 112 (b) (3), we are, nevertheless, of the opinion that petitioner can not qualify under section 113 (a) (7). That section relates to transfers to corporations where control of the property remains in the same persons. It is an exception to the general rule that the basis of property shall be the cost of such property. Sec. 113 (a). The property in question was acquired by petitioner after December 31, 1917, in connection with a reorganization. But an interest or control in such property of 50 per cent or more did not remain immediately after the transfer in the same persons or any of them. The stockholders of Detwiler and Detwiler were eliminated under the plan of reorganization. The only persons interested in the property transferred who continued to have an interest therein after the reorganization were the bondholders. *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra; Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185. After the reorganization the bondholders of Detwiler held only 49 per cent of the common stock. The Coleman interests upon completion of the plan of reorganization held 51 per cent of the common and all outstanding preferred stock, which had equal voting rights with common. It can not be said, therefore, that the same persons or any of them held an interest or control in the property of 50 per cent or more. *Lehigh Metals Co.*, 6 T. C. 313.

Petitioner attempts to capitalize on the failure of the books to record the issuance of stock to the Coleman interests immediately after the transfer of the property. But the plan of reorganization clearly provided that the Coleman interests should have at least 51 per cent of the voting stock, and it is the situation upon completion of the plan, rather than any failure to *immediately* issue the stock, that is determinative of whether petitioner qualified under section 113 (a) (7). It is perfectly clear from our findings that all of petitioner's preferred stock and 542 out of 1,063 shares of its common stock were held by the Coleman interests. It is equally clear that the Coleman interests were outsiders, who bought a majority interest in petitioner's stock for cash.

Section 113 (a) (8) of the 1934 Act is also inapplicable, since (A) thereof relates to a transaction described in section 112 (b) (5) and (B) relates to property acquired as paid-in surplus or as a contribution to capital. Section 112 (b) (5) deals with transfers to a corporation controlled by the transferor, a situation not here involved. The property here was acquired by petitioner by issuance of its stock and not as a contribution to capital or as paid-in surplus.

In view of our determination that petitioner is not entitled to the basis of the transferor under section 113 (a) (7) or (8) of the Revenue Act of 1934, as provided in section 113 (a) (16) of the Revenue Acts

of 1936 and 1938, we must determine petitioner's basis under the general rule provided in section 113 (a) of the Revenue Acts of 1936 and 1938, which is the cost of such property. The facts show that petitioner issued 521 shares of its common stock and assumed $66,000 of liabilities in order to acquire properties having an admitted fair market value of over $247,000.[2] The value originally set up on petitioner's books for the 521 shares of stock was $22,924.25. Petitioner contends that the basis of the property acquired was "cost," measured by the value of the stock exchanged therefor plus the cash paid and the liabilities assumed. It is further contended that the value of the stock must be determined by the fair market value of the assets acquired, citing numerous authorities.

Respondent agrees that the cost of the property acquired by a corporation for its stock is the fair market value of the stock on the date issued. *Ida I. McKinney*, 32 B. T. A. 450; affd., 87 Fed. (2d) 811, and cases there cited. But it is contended that the fair market value of the property turned in only becomes important when that is the *only measure* of the cost of the stock. It is contended that here the preferred stock and 51 per cent of the common stock were sold for cash and there is no evidence that the $22,924.25 allocated to 521 shares of common is not the fair market value of the shares issued for the property.

It is apparent from the book entries that the original amount set up on petitioner's books for the common stock did not, nor was it intended to, represent the value thereof. The entries with respect to the preferred and common stock issued to the Coleman interests and the treatment of the preferred stock issue show that the preferred stock represented the cash investment and the common stock evidenced the control of petitioner secured by the Coleman interests. Petitioner's allocation of the cash paid in to its preferred and the redemption of 530 shares during the taxable years, together with the convertible rights and the noncumulative provisions of the stock for the first five years, indicate that the preferred stock was regarded more as a loan arrangement than an ordinary corporate preferred issue. It is not surprising therefore that the original amount set up on petitioner's books for 521 shares of common continued to be the book value for 1,063 shares, since the 521 shares represented the assets acquired and the 542 shares represented the management, operation, and control of the acquired assets. It seems obvious that the bondholders of Detwiler desired operation of the properties by the Coleman interests and that they accepted the plan of reorganization here consummated with

---

[2] This total, as shown by our findings, consists of building, $127,725.28; equipment, furniture and fixtures, $22,274.72; unexpired portion of lease, $67,468.98; accounts and notes receivable, $16,093.29; cash, $5,398.11; prepaid taxes, $5,094.93; and paid-up insurance, $3,846.59.

full knowledge that control of the properties passed out of their hands and into the hands of the Coleman interests.

The circumstances under which the petitioner's stock was sold to the Coleman interests were not therefore determinative of the fair market value of petitioner's common stock.[3] There was in fact no market for such stock. The only parties interested therein were the bondholders and the Coleman interests. The considerations that moved them to acquire the stock were entirely foreign to conditions prevailing in a market created by buyers and sellers. Under these facts we think the value of the stock must be deemed equivalent in value to the property for which issued. *William Ziegler, Jr.*, 1 B. T. A. 186. Since the parties have stipulated the values of the depreciable assets acquired, we hold that petitioner is entitled to use those values as its bases for depreciation.

Respondent's determination that collections during the taxable years on accounts and notes receivable acquired in exchange for common stock constituted income is approved, as such assets had a zero basis, being offset by reserves. *Michael Carpenter Co.* v. *Commissioner*, 136 Fed. (2d) 51, affirming 47 B. T. A. 626.

*Decision will be entered under Rule 50.*

---

[3] *Premier Packing Co.*, 12 B. T. A. 637.