Kalmon Shoe Manufacturing Company v. Commissioner.
Kalmon Shoe Mfg. Co. v. Commissioner
Docket No. 84135.
United States Tax Court
T.C. Memo 1962-56; 1962 Tax Ct. Memo LEXIS 251; 21 T.C.M. (CCH) 305; T.C.M. (RIA) 62056; March 16, 1962
Milton H. Tucker, Esq., 611 Olive St., St. Louis, Mo., Abe J. Garland, Esq., and Jerome M. Rubenstein, Esq., for the petitioner. Edward E. Pigg, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined a deficiency of $46,323 in the income tax of the petitioner for the taxable period beginning February 1, 1955, and ended October 31, 1955. The sole issue for determination is the correctness of the respondent's action in determining that the cost to petitioner of its inventory on February 1, 1955, was $209,909.30 instead of $441,167.32 as used by petitioner in computing the cost of goods sold during the taxable period. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner is a Missouri corporation organized *252 on January 25, 1955, and has its principal office in St. Louis, Missouri. It filed its Federal income tax return for the taxable period beginning February 1, 1955, and ended October 31, 1955, with the director in St. Louis, Missouri. Paramount Shoe Manufacturing Company, a Missouri corporation, was organized on March 16, 1929, and had its plant and principal office in St. Louis, Missouri. It engaged in the manufacture of women's novelty or dress shoes. Beginning in 1947 it intermittently sustained losses from its operations and in its fiscal year ended October 31, 1954, sustained a loss of over $110,000. On October 31, 1954, Paramount had outstanding 17,250 shares of capital stock. Of those shares, 11,283 were owned by Wolff-Tober Shoe Manufacturing Company, hereinafter referred to as Wolff-Tober. The remainder, 5,967 shares, was owned in amounts ranging from 11 shares to 1,450 shares by Sam Wolff and a member of his family, Abe Tober and members of his family, Abe Tober and members of his family, and by other individuals, including Morris Kalmon and I. M. Kay. The officers and directors of Paramount during 1954 and to January 28, 1955, were as follows: A.E.M. (Abe) Tober Chairman of the Board
and Director
Sam Wolff
President, Treasurer, and
Director
Morris Kalmon
Vice-President, Secre-
tary and Director
(also General Mana-
ger)
H. E. (Harold) Tober [1]
Director
Elliott H. Stein
Director
I. M. Kay
Director
William Wolff [2]
Director
*253 Sam Wolff was the "active head" of Wolff-Tober, a Missouri corporation which was engaged in manufacturing women's novelty shoes in St. Louis, Missouri. That company, in addition to owning approximately two-thirds of the stock of Paramount, also owned the controlling stock interest in Carmo Shoe Manufacturing Company and Debs Shoe Company which were engaged in the shoe manufacturing business. Sam Wolff and Abe Tober owned in equal amounts a total of about 80 percent of the stock of Wolff-Tober. The remainder of the stock was owned by other individuals, including I. M. Kay. As a director of Paramount, Elliott H. Stein represented Etta E. Steinberg, Trustee, who owned 1,450 shares, the second largest number of shares of stock in that corporation. The monthly operating reports and the semiannual report of Paramount, prepared by its accountants for its fiscal year ended October 31, 1954, copies of which were furnished Paramount's directors, indicated that Paramount probably would sustain a substantial loss from its operations for that year. Beginning in May 1954 or earlier in the year, and continuing through the summer and into the fall *254 of 1954, Abe Tober, Sam Wolff, Morris Kalmon, Elliott H. Stein, and I. M. Kay, who were directors of Paramount and also important stockholders or represented important stockholders in it, held a number of meetings at which they considered Paramount's situation, its business prospects, and the possible remedies for improving them. Among the matters also considered at some of the later meetings was the discontinuance of the business of Paramount and its liquidation and, if it were liquidated, whether a greater net amount would be realized from a complete liquidation at one time by a single transaction or from a gradual liquidation over an extended period. Finally, about October or November 1954, a decision was reached to liquidate Paramount and if possible in a complete liquidation at one time by February 1, 1955. The foregoing date was selected because a continuance of operations beyond that date would require preparation, including the purchase of materials, for the fall season of 1955 and it was not desired that Paramount continue in business that long and incur that expense. The directors were of the opinion that a complete liquidation of Paramount made at one time would result in *255 the realization of a larger amount than a gradual liquidation. About the time the decision was reached to liquidate Paramount in the foregoing manner, Kalmon, who was general manager of Paramount and had been in its employment continuously since its inception in 1929, informed the other of the abovementioned directors, sometimes hereinafter referred to as the other directors, that he desired to purchase Paramount as a going business and to pay therefor an amount representing the estimated net amount that would be realized from a liquidation of Paramount in a complete liquidation made at one time. The other directors were agreeable to a consideration of Kalmon's desire. However, there immediately arose a difference of opinion between him and them as to the net amount that would be realized from the liquidation of Paramount in such a liquidation. At that time the book value, that is, the net asset value of Paramount's stock, was about $43 per share. The directors set a value which would net $45 per share of Paramount's stock. Kalmon made an offer that would net $25 per share of the stock. Negotiations between the other directors and Kalmon followed during which the other directors *256 reduced their asking price to $35 per share and Kalmon raised his offer to $30 per share. Then for a time neither side was willing to change its position. The negotiations finally terminated on or about December 1, 1954, by both sides agreeing to an amount which would net $32.50 per share of Paramount's stock which was suggested by I. M. Kay. At that time Kay had been in the shoe business for about 25 years, had been a director of Paramount for about 10 years, and about January or February 1954 had purchased 500 shares of stock in Paramount at $25 a share. The agreement thus reached by Kalmon with Abe Tober, Sam Wolff, Elliott H. Stein, and I. M. Kay, but never reduced to writing and signed by the parties, was in substance that Kalmon would acquire Paramount as a going business by paying therefor an amount which would net the stockholders of Paramount $32.50 per share for their stock in it totaling 17,250 shares or a total amount of $560,625. After the above-mentioned agreement had been reached by Kalmon and the other directors of Paramount and before Kalmon had made payment of any amount, the directors of Paramount, on or about December 8, 1954, held a meeting in the office of Karol *257 Korngold, who was the attorney for Sam Wolff, Abe Tober, Wolff-Tober, and Paramount. Following the meeting, Korngold sent a letter to each of Paramount's stockholders wherein it was stated that Paramount would purchase up to 7,000 shares of its stock at $32.50 per share if the shares were submitted by January 10, 1955. Pursuant to the letter, all of the minority stockholders submitted all of their stock totaling 5,967 shares and prior to January 31, 1955, Paramount paid therefor $32.50 per share or a total of $193,927.50. Wolff-Tober which owned the remaining 11,283 shares of Paramount's stock did not submit any portion of the shares it owned. After the meeting of the board of directors of Paramount on December 8, 1954, Kalmon contacted his attorney and instructed him to contact Korngold and the auditor for Paramount who also was the auditor for Wolff-Tober and work out his (Kalmon's) acquisition of Paramount as a going business. Subsequently Kalmon met with his attorney who informed him that for tax reasons Wolff-Tober was not willing to sell its stock in Paramount and he advised Kalmon for tax reasons not to purchase the assets of Paramount. In the foregoing situation and in *258 order to effect the acquisition by Kalmon of Paramount as a going business, Paramount, Kalmon, and two others, Joseph Goldstein and Irvin Rubenstein who previously had agreed with Kalmon to become associated with him in the acquisition of Paramount, on January 26, 1955, entered into a written agreement which provided that prior to February 1, 1955, Paramount would organize Kalmon Shoe Manufacturing Company as a Missouri corporation, the petitioner herein, with an authorized capital stock of 1,000 shares of no par value; that on February 1, 1955, Paramount would transfer, with certain stated exceptions, all of its assets to petitioner which in consideration therefor would issue its 1,000 shares of capital stock to Paramount and in addition assume all of Paramount's liabilities incurred prior to February 1, 1955, exclusive of liability for Federal and state income taxes for the period November 1, 1954, to February 1, 1955; that on February 15, 1955, Paramount would sell at $100 per share its 1,000 shares of stock in petitioner to the following persons in the indicated amounts: Morris Kalmon
600 shares
Joseph Goldstein
200 shares
Irvin Rubenstein
200 shares and that *259 during the period from February 1 to February 15, 1955, the business of the petitioner would be conducted in the same general manner as Paramount had operated it in the past. The foregoing agreement was carried out as provided therein and pursuant to the agreement the following was done: Kalmon Shoe Manufacturing Company (the petitioner herein) was incorporated under the laws of the State of Missouri on January 25, 1955. On February 1, 1955, Paramount transferred and assigned to petitioner, all of Paramount's assets, as more particularly described in said agreement, and excepting only certain life insurance policies owned by Paramount having a cash surrender value of $48,733.91, a claim for refund against the United States for income taxes in the amount of $45,272.02, and cash in the amount of $175,691.57, and simultaneously petitioner issued 1,000 shares of its capital stock to Paramount, being all of the issued and outstanding capital stock of petitioner, and assumed liabilities of Paramount in the total amount of $269,289.44. On February 15, 1955, Paramount transferred to Morris Kalmon for $60,000 cash, 600 shares of the capital stock of petitioner and transferred to each *260 of Joseph Goldstein and Irvin Rubenstein for a consideration of $20,000 each, 200 shares of the capital stock of petitioner. The foregoing transfers of stock in petitioner culminated a series of steps in carrying out the agreement entered into about December 1, 1954, by Kalmon and the other directors of Paramount for Kalmon to acquire Paramount as a going business. The assets which Paramount had after the transfers of the petitioner's stock on February 15, 1955, had an actual value of $369,697.50, which was $3,000 more than $366,697.50, which latter amount would be at the rate of $32.50 per share for the 11,283 shares of Paramount stock then outstanding and which was then all owned by Wolff-Tober. The $3,000 additional amount was to take care of any tax liability for the operations of Paramount between October 31, 1954, and January 31, 1955. Thus in actuality it was contemplated that the Paramount stock, after the completion of the transaction and the payment of estimated state and Federal income taxes applicable to the 3-month period, would still have a book value of $32.50 per share for the then outstanding 11,283 shares or an aggregate amount of $366,697.50. The adjusted cost *261 basis (and book basis) of Paramount of the assets transferred to petitioner on February 1, 1955, was as follows: Cash
$ 24,063.09
Accounts receivable
31,863.85
Inventory
441,167.32
Building, equipment, furniture & fix-
tures
52,672.06
Land
18,453.09
Prepaid expenses
7,884.25
Total
$576,103.66
In its income tax return for the taxable period beginning February 1, 1955, and ended October 31, 1955, the petitioner treated the transaction under which it, on February 1, 1955, acquired from Paramount the above-listed group of assets in exchange for its (petitioner's) stock and its assumption of the liabilities of Paramount, as a nontaxable reorganization and, in computing the cost of goods sold by it during the taxable period, used as its inventory at the beginning of the period, February 1, 1955, the amount of $441,167.32, which was the same amount as the adjusted cost basis (and book basis) of the inventory to Paramount. In determining the deficiency involved herein, the respondent determined that the cost to the petitioner of its inventory at February 1, 1955, was $209,909.30 and accordingly increased the petitioner's taxable income by $231,258.09. The *262 value on February 1, 1955, of the assets acquired by petitioner from Paramount on that date was $369,289.44 of which $234,353.10 was the value of the inventory. The value of the 1,000 shares of stock issued by petitioner to Paramount on February 1, 1955, was $100,000 on that date. The cost to petitioner of the inventory acquired by it from Paramount on February 1, 1955, was $234,353.10. Opinion The petitioner contends that in computing its cost of goods sold during the taxable period involved herein it properly used $441,167.32 as the amount of its inventory at the beginning of the period, February 1, 1955. The respondent contends that the amount of $209,909.30 used by him for such inventory in determining the deficiency is supported by the record and should be sustained. In its income tax return the petitioner treated as a nontaxable transaction the transaction in which it acquired the group of assets from Paramount in exchange for all of its (petitioner's) stock and its assumption of Paramount's liabilities. On brief the petitioner concedes that was error, that the transaction was a taxable one and that as a consequence the basis of the assets in its hands was cost as provided *263 by section 1012 of the Internal Revenue Code of 1954 and not the adjusted cost basis (and book basis) of the assets to Paramount. Concededly the only cost of the assets to the petitioner was all of its capital stock, 1,000 shares, which it issued to Paramount and its assumption of Paramount's liabilities amounting to $269,289.44. The agreement of January 26, 1955, between Paramount and Morris Kalmon and his associates pursuant to which the transaction in question was carried out contained no provision as to the segregation or allocation of the assets between the stock and the liabilities. However, the agreement did firmly obligate Paramount to sell on February 15, 1955, and Morris Kalmon and his associates to buy on that date all of the 1,000 shares of stock in petitioner at a price of "$100.00 cash per share." Ida I. McKinney, 32 B.T.A. 450 (1935), affd. 87 F. 2d 811 (C.A. 10, 1937), involved the question of the method for determining the cost to a corporation of assets acquired for stock. There it was said: It is well settled that the cost to a corporation of the property acquired through the issuance of its capital stock is *264 the fair market value of such capital stock on the date issued, and where all of the capital stock of a corporation is issued for property and there is no other method of measuring the fair market value of the stock so issued, such fair market value on that date may properly be determined to be the equivalent of the fair market value of the property received. Reliance Investment Co., 22 B.T.A. 1287; Mead Realty Co., 21 B.T.A. 1062; L. H. Philco Corporation, 16 B.T.A. 130; John Glackner Realty Corporation, 11 B.T.A. 151; Realty Sales Co., 10 B.T.A. 1217. [Italics added.] A like question again was presented in C. D. Johnson Lumber Corporation, 12 T.C. 348 (1949), where it was said: It is settled that the cost of property acquired for shares of stock is the fair market value of the shares, and if, as here, a corporation's entire stock is issued for the acquisition the value of the properties acquired, with the addition of any cash paid and obligations assumed, may be accepted as a measure of the value of the shares and hence of the cost of the properties, in the absence of sales or other evidence of share *265 value. Champlin Refining Co. v. Commissioner (C.C.A., 10th Cir.), 123 Fed. (2d) 202; Four Twelve West Sixth Co., 7 T.C. 26; Stollberg Hardware Co., 46 B.T.A. 788; Amerex Holding Corporation, 37 B.T.A. 1169; affd. (C.C.A., 2d Cir.), 117 Fed. (2d) 1009; certiorari denied, 314 U.S. 620. It is likewise recognized that a bid or contract price is not necessarily cost if circumstances vest the figure with a purely arbitrary or perfunctory character, Helvering v. New President Corporation (C.C.A., 8th Cir.), 122 Fed. (2d) 92; La Arcada Bondholders Committee, 35 B.T.A. 80; Suncrest Lumber Co., 25 B.T.A. 375, if the total consideration is paid for a mixed aggregate of assets, its allocation among the several properties acquired should be based upon the relative value of each item to the value of the whole. Cf. Nathan Blum, 5 T.C. 702; Clifford Hemphill, 25 B.T.A. 1351. The petitioner contends that the group of assets it acquired on February 1, 1955, from Paramount had on that date a fair market value of $576,103.66, an amount identical with their *266 adjusted cost basis (and book basis) to Paramount on February 1, 1955. On the basis that the assets had a fair market value of $576,103.66, the petitioner urges that the fair market value of the 1,000 shares of stock it issued to Paramount had a value at the time of issuance, February 1, 1955, of $576,103.66, less the amount of the assumed liabilities of Paramount, $269,289.44, or $306,814.22. The petitioner further urges that having exchanged stock of a value of $306,814.22 and having assumed Paramount's liabilities of $269,289.44 for the assets, the cost to it of the assets acquired from Paramount was $576,103.66, and that a proper allocation of that amount to the assets results in its inventory on February 1, 1955, having a cost to it of $441,167.32. From the foregoing it is obvious that the petitioner grounds its position on the contention that on February 1, 1955, the assets had a fair market value of $576,103.66. The respondent concedes that, excepting the inventory, the assets had a fair market value equal to the amounts shown on the books of Paramount or a total of $134,936.34. The petitioner make a like concession. That leaves for consideration the question of the value *267 of the inventory which petitioner contends had a value of $441,167.32 and which the respondent determined had a value of $209,909.30. In support of its position that the inventory had a value of $441,167.32, the petitioner relies on the testimony of a witness for it, the "purchasing agent and labor relations man" of Paramount who since the inception of petitioner has occupied a similar position with petitioner. He stated that the inventory was taken under his supervision between January 28 and February 1, 1955, and that in his opinion the amount of $441,167.32 represented the lower of cost or market value of the total inventory of Paramount at that time. On the other hand, a witness for the respondent, Sam Wolff, who has been in the shoe manufacturing business since 1920, who was the active head of Wolff-Tober, and who was president of Paramount in 1954 and 1955, expressed the opinion that Paramount could not have sold its inventory to any other purchaser for a greater amount than it realized as a result of the agreement entered into about December 1, 1954, by Morris Kalmon and the other directors. The petitioner asks that for valuation purposes we do not accept as conclusive of *268 the value of 1,000 shares of its stock the amount of $100,000 which Paramount on February 15, 1955, received from Morris Kalmon and his associates for the stock. The petitioner bases its request on the ground that the sale was in the nature of a forced or compulsory sale resulting from the fact that Paramount during its fiscal year ended October 31, 1954, sustained a loss of over $110,000 and the decision of the major stockholders to get it out of business as fast as possible so as not to lose what remained of their investment in it. In connection with its request the petitioner cites a number of cases involving sales ranging from those made by a receiver or sheriff to those made without negotiation or without regard to the value of the property sold and in which it was held that the sale prices involved therein did not correctly reflect the value of the properties there under consideration. From our consideration of the cited cases, the holdings therein were reached not merely because of the circumstances surrounding the sales but because the evidence presented as to value when taken as a whole required the conclusion that the sales prices involved did not correctly reflect the values *269 of the subject properties. As has been said many times, value is a question of fact to be determined from all the evidence as to value presented in a given case. Here the parties have stipulated the amount of Paramount's liabilities assumed by petitioner. The parties are in agreement as to the value of all the assets acquired by petitioner from Paramount, except the value of the inventory. We have testimony directed to the value of the inventory. Finally, we have a stipulation showing the transfer on February 15, 1955, by Paramount of all of the stock in petitioner to Morris Kalmon and his associates for $100,000. The sale was the culmination of a series of steps taken in carrying out an agreement entered into more than 2 months earlier by Kalmon and the other directors of Paramount who were either the principal stockholders of Paramount or represented its principal stockholders. Most, if not all, of the other directors were men well acquainted with the shoe manufacturing business, had long experience in it, and were fully informed as to Paramount and its business. They, with that background, conducted extended negotiations with Kalmon respecting the payment to be made by him to *270 acquire Paramount as a going business. The agreement as made under the foregoing circumstances was carried out in substance. From our consideration of the record before us we are of the opinion and have so found as facts that the value on February 1, 1955, of the assets acquired by petitioner from Paramount on that date was $369,289.44 of which $234,353.10 was the value of the inventory, that the value of the 1,000 shares of stock issued by petitioner to Paramount on February 1, 1955, was $100,000 on that date, and that the cost to petitioner of the inventory acquired by it from Paramount on that date was $234,353.10. Decision will be entered under Rule 50. Footnotes
1. Son of Abe Tober. ↩
2. Son of Sam Wolff.↩